# Federal Defenders
## OF NEW YORK, INC.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __11/24/2025__

Tamara L. Giwa
*Executive Director*

November 21, 2025

**VIA EMAIL & ECF**
The Honorable Nelson S. Román
United States District Judge
Southern District of New York
Charles L. Brieant, Jr. Federal Building
and United States Courthouse
300 Quarropas Street
White Plains, New York 10601



Erick, his twin brother, Anthony, and mother,Gloria

Re:    ***United States v. Erick Grigoroff,***
         **25 Cr. 390 (NSR)**

Dear Honorable Judge Román,

**The Clerk of Court is kindly directed to terminate the motion at ECF No. 23.**

**Dated: November 24, 2025**
**White Plains, New York**

SO ORDERED:

HON. NELSON S. ROMÁN
UNITED STATES DISTRICT JUDGE

**MEMO ENDORSED**

## Introduction

When hardworking, loving, single mother, Gloria Grigoroff, moved her family to the Village of Croton-on-Hudson ("Croton") from South Yonkers for a better life in the nineties, she could have never imagined that both of her youngest twin sons would be criminalized in their childhood and end up serving over a decade in jail as young adults.

"*When you move to a better neighborhood, it's supposed to be safer and more free, but for us, it wasn't like that,*" Ms. Grigoroff laments.

In Croton, which is in Cortlandt, Westchester County, the Grigoroff family (who are Honduran-and-Russian-American) was met with racial profiling and biased, disparate treatment in schools, in the child welfare system, with police and in courts.  On their first day of school, Ms. Grigoroff remembers that they were unfairly pegged as a "social services family."  When Erick and his twin brother, Anthony, were just little boys, only 8 years old, they were called "gang members" by some school staff.  These are just a few of the many examples of discrimination,

1

prejudice and inequality that the Grigoroffs faced in Croton. These experiences would shape Erick's life for years to come.

Some of Erick's teachers described another side of Erick, though. The side which his family and friends know as the real him: an "affectionate boy" and a good student, who did his best work when he sat next to the teacher, responded well to praise and loved to help with classroom chores. They asked for him to have more one-on-one, sit-down time with his mother at home because that was what he needed to help his grades

to adults who are trying to help him. He has had lunch detention several times, has been forbidden to participate in recess and has been spoken to by Mrs. Allan, our principal more than once. Unless Erick's behavior improves, progress will be rather limited.

On the other hand Erick does have a more sensitive side. He responds to praise, loves to sit next to me to do his work and loves to help with classroom chores. Although Mrs. Higgins teaches Erick reading, writing and math, I enjoy hearing him read at other times during the day and seeing the work that he does before he takes it home. Erick has the potential of becoming a good student but it's overshadowed by all the negativism.

I suggest that we meet to discuss this report. We'll arrange a conference at your convenience.

Excerpt from Erick Grigoroff's 2nd Grade Report Card

Ms. Grigoroff revealed CPS has been involved with the family in the past. She stated in the year 2000, the school her other son, Erick, was attending called CPS because she wasn't willing to sign the paperwork to have him hospitalized at Four Winds. She then added CPS was involved with the family again in 2002 because a neighbor was complaining about her twin sons. This Officer spoke to Mr. Paul Tavolacci, the CPS worker in 2002. He concurred with Ms. Grigoroff's statement and said CPS had received an anonymous call from someone alleging the twin boys were "staying and hanging out late," smoking cigarettes and dealing drugs on the front porch of their house. However, he reported the case was unfounded.

Excerpt from Erick Grigoroff's OCFS records

improve. His mother worked long hours in a nursing home, spent hours commuting to work on the bus and necessarily relied on her older siblings to help raise him. She was forced to defend herself and her children against at least two unfounded complaints

about their family from neighbors to Child Protective Services. Erik's father was mostly absent, and when he was around, he was sleeping (PSR ¶ 40). Unfortunately, the biased treatment Erick faced in school and the community meant that it would take years for him to gain insight into his mental health and to finally take steps towards ending the cycle of troubles that have plagued his life.

Recently becoming a father last year has changed everything for Erick. He is motivated to correct his path and determined to seek mental health treatment (which he did last year, voluntarily (Exhibit A – Westchester Medical Center Inpatient Behavioral Health Form)), and to lead a stable, law-abiding life. His primary goal is to be there for his daughter as a good father should. He is deeply disappointed that he has let her down with his actions in this case, but he is ready to move forward beyond his past, because of her and his aging mother, most of all. For these reasons, we ask Your Honor to vary a great deal downwards from his Guidelines and impose a sentence of 24 months' incarceration. This

variance would be to a sentence in the middle of the range of what Erick's Guidelines would be $(21 - 27$ months), if two of his prior convictions, from when he was 17 and 18 years old, did not count towards his Criminal History Calculation and as an enhancement to his base offense level under USSG **§** 2K2.1.

To see Erick as only the labels his rap sheet has put on him, would be to ignore the complexities of his life and social circumstances growing up in an unforgiving, racially divided town.  (*See* Exhibit B, Letter by Dan Greenwood, friend of Erick Grigoroff).  It would be to ignore the man his family and friends know him as, a man with a "huge heart" (*See* Exhibits B-G), letters from Erick Grigoroff's family and friends). With the empowering knowledge of his diagnosis, that he learned of last year, Erick is determined to chart a new course.  He will do so with the motivation, resources and maturity that he has gained since the birth of his first child.



My father already died, and [my mother] is all I have left. I was arrested on her 63rd birthday. I still remember her crying when I called her from the police station after I was arrested. It broke my heart. I am away from my daughter, who was only months old when I was arrested. When I see my daughter during our jail visits it makes me want to be there for her. I never felt this responsibility for someone else. It's something new to me, being a father. I am still learning. I want to make her life better. Whenever I am released, I plan on making up for lost time with my daughter and my partner.

Exhibit H – Letter by Erick Grigoroff.

1. **The Nature and Circumstances of the Offense and Erick's History and Characteristics**

   a. **The Offense**

On March 5, 2025, it was Gloria Grigoroff's birthday.  She and Erick's girlfriend, Jocelyn Marrero, were about to get ready to head to a birthday dinner for her, and to pick Erick up.  At 3:20 p.m., law enforcement approached a car that Erick and two acquaintances of his were in, after the driver parked it at a gas station. (*See* PSR ¶ 5).  The driver is alleged to have failed to maintain her lane in Yorktown Heights at some point prior to stopping at the gas station. (*See id.*). There was no police dashboard camera of the alleged traffic violation.  On the police's bodyworn camera footage, the driver appears to deny having committed any traffic violation when she is speaking to police.  As one of the officers approached the car, he observed Erick, who was seated in the rear passenger seat of the car,

3

leaning forward and appearing to reach underneath the front passenger seat in front of him. (*Id.*). When the officer looked in that area with a flashlight after having Erick exit the car, he observed a gun under the front passenger seat. (PSR ¶ 8).  Erick was placed under arrest.  He waived his *Miranda* rights and admitted to owning the gun.

### b. Adjustment to Incarceration, Post-Offense Rehabilitation, Acceptance of Responsibility

Erick consented to detention following his arrest on March 5, 2025.  (*U.S.A. v. Grigoroff*, No. 25-CR-390-NSR, ECF #2, 3/6/25).  He has been incarcerated at Westchester County Jail since that day, for the past eight months.  He became a trustee at the jail, which allows him to hold jobs cleaning and as a barber.  Within five months of being arrested, Erick pled guilty to one count of possession of a firearm as a prohibited person, 18 U.S.C. § 922(g)(1), before the Honorable Judge Reznick. In his Guidelines calculation, he receives 3 points off for timely acceptance of responsibility, but that does not capture that he also gave up seeking a suppression hearing in his case.  His acceptance of responsibility goes a step further, for this reason, and that should be considered by Your Honor.

### i. ████████ ████████ Before and After Arrest

Two months prior to his arrest in this case, █████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████  (See PSR ¶ 50).
Though it was his daughter's first Christmas, he made the painful decision to spend it away from her, because he recognized the weight of his █████████████ and wished not to expose her, and his family to it.  It was his first time seeking ██████████ ████████████.  A goal of becoming a better man and father was at the root of it.





He has been fortunate enough that his loving girlfriend, Jocelyn, has visited him faithfully throughout his time at the jail, bringing their daughter with her each time, so she will continue to know her father. (PSR ¶49). And, so Erick will continue to be motivated to manage his condition and remain hopeful.

As an adult, Erick has faced the challenges of living with ▮▮▮▮. While we can never fully know how it shaped his childhood, we have seen its effects in his adult life. Despite these battles, Erick has shown resilience and the ability to grow. When he became a father, I watched him soften, shift, and strive to be a light for his daughter and even for my own children. In the middle of his personal storm, he worked to be someone they could depend on — and that speaks volumes about the man he is at his core.

Erick is detail-oriented, selfless, and deeply compassionate. He has always been the kind of person who would give his last to someone in need, even if it meant going without himself. These qualities, when paired with the right support and guidance, can help him thrive not just

as a father and family man, but also as a contributing member of his community.

Looking forward, Erick has expressed a genuine desire for change and rehabilitation. He is committed to seeking counseling and therapy to better manage his ██████████████ we have talked about building a more stable future together.

Exhibit C – Letter by Jocelyn Marrero, girlfriend of Erick Grigoroff.

Erick's willingness to seek ████████████████ last year, despite that it meant spending Christmas and New Year's Eve ██████████, along with his continued efforts at ████████████████, and the strong support he has from his girlfriend and family are compelling indicators of his decreased, low risk for recidivism. After serving his last prison sentence, Erick was successful on parole supervision from 2022 until 2024, and was discharged with no revocations, another indicator that he will be amenable to supervision.

### c. Erick's Upbringing, History and Characteristics



Erick was born in 1990, in the projects in South Yonkers, and grew up there until he was six years old. Then his mother moved him and her four other children to Croton. She worried about her kids, especially her sons, continuing to grow up around the poverty, drugs and violence that she saw in their projects and neighborhood.

For the most part we did grow up in Yonkers. Eventually, my mom noticed that if you change the scenery, maybe you could change someone's actions so she took us to Croton-on-the-Hudson.

Exhibit D – Letter by Gregory Grigoroff, Erick's older brother. Erick's father unfortunately did not play much of a role in raising Erick and his siblings. When he was around, he would "come home to sleep." He was often in Honduras. (*See* PSR ¶ 40).

. . . both my brothers mean the world to me and our family, especially to my mother. . . Eric is also a twin and me and my sisters we help raise my little brothers. We didn't really have a dad in our life. He wasn't too

far, but he wasn't exactly in our life for certain lessons. . . Me and my brothers all learned, I would say, the hard way.

Exh D.  Their older siblings cared for Erick and Anthony while Ms. Grigoroff worked double shifts at ███████████████. Ms. Grigoroff remembers that Erick loved to ride his bike around the neighborhood, and sometimes, when the weather was warm, would do so until 7 p.m.  Ms. Grigoroff thought since they lived in a safer neighborhood, this was alright.  But even something as innocuous as this stirred up trouble for the Grigoroffs.  Ms. Grigoroff remembers neighbors calling the police over this and school staff warning her that this behavior was unacceptable and could result in a Child Protective Services case. It was hard for Erick and the family to reconcile being treated this way with their expectations about a better life in this better area.  Ms. Grigoroff, though she worked long hours, was an involved, doting parent.  Some of Erick's teachers recognized this as well as Erick's potential, while police and other school staff came down hard against Erick and his family.

Erick  Grigoroff
June 1998

I have enjoyed knowing Erick and spending the year with him.  He is a funny, sweet and affectionate child.  He continues to make progress in all academic areas.  His confidence as a reader and writer has grown steadily since September.  It has been a pleasure to watch him grow and bloom.

Erick worked very diligently on several writing pieces: his first research report on rabbits for his animal in winter study, his poem, *Birds* , his letter to an incoming first grader and letters to his pen pals.  His writing shows increasing attention to the visual patterns in spelling and he is learning to use capitals and punctuate appropriately.  He is able to articulate his thoughts and capture them on paper.  I am very proud of his efforts.  Erick's penmanship has improved since September and he is taking more care and time when forming his letters.  I am especially proud of Erick for the decision he made to do his homework every night.  Keep it up!  Erick has benefited greatly from the supports he has received from Mrs. Reagan and Mrs. Hirschman.

Erick likes math and is eager to engage in the many math tubbing games and activities in the class.  He confidently performs 1 digit addition and subtraction, 2 digit addition without regrouping, writes and computes number stories and counts combinations of money using pennies, nickels and dimes.  He has a good understanding of beginning fractions and can tell time on the hour and half hour.

Erick has had a great year and has made many friends.  Erick is working at controlling and monitoring his behavior and has made improvements.  He needs to continue to work on this area of his growth.  We loved having you and Sandra come into the class to share the delicious chicken, rice and bean dishes.  We especially liked dancing the salsa.  That day was an important one to both Erick and Anthony.  I will miss Erick and will look forward to his visits when in second grade.  It has been great knowing you all and I appreciate all your help this year.  Have a wonderful summer.

Love,
Ms. Siegel

Promoted  to  second  grade

Excerpt from Erick's 1st Grade Report Card

When Erik was only in the fourth grade, at 8 years old, he was taken out of school after he brought water guns to school and was accused of threatening to shoot a classmate.  The school's response was to remove him and have him ██████████████████████████████████l.  (*See* Exh. D, PSR ¶ 51).  He was required to attend ████████████████████████ He ultimately was not ██████████████████.  He was never permitted to come back to his school. Such a disproportionate, highly punitive response would be the beginning of a cycle of excessive, inappropriate, damaging interventions by Croton's institutions against Erick and the Grigoroff family.

A few years later, at only 13 years old, Erick was again ripped away from his family too young and ▮▮▮▮▮ from an incident where he and Anthony were alleged to have keyed a car and were placed on Probation in Family Court. Erick was later deemed to have violated his probation by shoplifting, and was then ▮▮▮▮▮ ▮▮▮▮▮. This absolutely crushed Erick and his family. Ms. Grigoroff and Gregory, who was only a teenager, protested this as much as they could, but they were powerless against the system. Erick could only go home to visit his family on certain weekends, and as punishments, visits were revoked if Erick was deemed to have ▮▮▮▮▮ ▮▮▮▮▮. At the extremely young ages of 8 and 13, Erick began to be institutionalized and traumatized by these experiences.

When I got put into ▮▮▮▮▮ I was so young and it was so hard to understand what was really going on. I remember feeling really bad to be separated from everyone else. My brother Greg would come with me for the first couple of days. He was only 15 at that time. There was groups and therapy. I didn't know why I was there. From then on I never went back to regular school again. I knew I should have been in school with everybody else. I felt confused, unfairly punished, and like no one would ever listen to me.

Exh. H. The Grigoroff family was floored by what they viewed as racist, discriminatory treatment by Westchester Child Protective Services and the Office of Children and Family Services. The New York State Bar Association, as well as numerous other organizations and reputable news outlets have reported on the Child Protective System in New York State, finding it replete with systemic racism.[1]

---

[1]    *New York State Bar Association Finds Child Welfare System Replete With Systemic Racism, Pushes for Reforms*, https://tinyurl.com/em2z8xpf

U.S. Commission on Civil Rights, *Examining the New York Child Welfare System and Its Impact on Black Children and Families,* https://www.usccr.gov/files/2024-05/ny-child-welfare-system-sac-report.pdf

I believe [in Croton] is where my brother was getting the short end of the stick. One of the first incidents was that my brother got in trouble for was he brought two water guns to school and the school I believe took it a little too far for a child bringing in a toy and then from there on he wasn't allowed in a normal school like everyone else he had to go to a special school because of this incident and it wasn't really that serious. It was water guns, he wanted to enjoy time with his friends playing around with water guns and they didn't look nothing like real guns they were orange and green and like a super soaker from the early 90s or late 90s, it was a big thing but that's where my brother first got in trouble and the police in that town took notice of me and my family.

Exh. D – Letter by Gregory Grigoroff, older brother of Erick Grigoroff.

It is not surprising that now, as a 35-year-old man, Erick suffers from the lasting effects of these early, harmful overreaches into his life, let alone the prison sentences he served as a teenager in adult prison, ███████████████████ ███████████████████ *See* Exh. I.

Erick has faced many struggles throughout his life. From the time he was a child, he experienced racism and discrimination in school, which left him feeling different and often unwelcome. . . As an adult, he was ███████████████, something that finally explained the struggles and challenges he carried for so long without understanding why.

Exhibit E – Letter by Gloria Grigoroff, mother of Erick Grigoroff. As such a young child, instead of being treated as a member of his community, and with understanding and compassion, Erick was punished and locked away, even though he was just a young teen. Undoubtedly, Erick would experience profound emotional trauma and ███████████████ ███████████████████ by the prison sentences he would end up serving as a teenager.

When Erick was 17, on Halloween, he was at a bar with Anthony, a friend and his girlfriend. A large Peekskill gang called G-4 started a fight with them while there. There were about 50 individuals from, or with, this gang at the bar. Erick reacted to the attack by stabbing one of the individuals in the side of his waist. He was arrested, kept in jail on bail he could not afford, for five months, and then sentenced to probation following a plea of guilty. (PSI ¶ 26).

A year and half later, at 18 years old, he was again in a bar when a fight broke out. This fight, as the one before, was also a massive melee. Individuals from the large group were the initial aggressors against Erick, Anthony and their one

friend who was with them. During this fight, Anthony was beaten and injured so badly, he had to be airlifted to the hospital. The urge to protect his twin brother prompted Erick to use a gun and fire a shot into the crowd. He was sentenced to five years' imprisonment, along with two-and-a-half years to be served consecutively for the probation violation of his previous case, totaling seven and a half years, at only 18 years old. He served almost the entire sentence imprisoned, seven years and one month. He was not afforded Youthful Offender treatment for either case, and never had the opportunity to try to earn a non-criminal conviction through programming for at-risk youth, which New York State law provides for, for youth aged up to 19 years old.[2] Again, Erick was cast aside and the court did not offer him the protection the law is intended to offer young people like him.

To make matters even worse, Erick was incarcerated in adult prisons in New York State, even though he was only 18. When he was released from prison, he was 25 years old. He had missed out on spending his formative years doing what young people should be doing during that time: attending college, establishing autonomy and identity, forming intimate relationships, and building a career path. Exh I.

While Erick was serving his sentence, his twin brother, Anthony, also came up against the long arm of the law in Putnam County. In 2008, a man was killed in Garrison in what was initially believed to be a hit-and-run.[3] Six months later, when 18-year-old Anthony Grigoroff was in jail for an unrelated matter, he became a suspect in the killing, and endured a 12-hour interrogation by multiple teams of police investigators.[4] He was convicted after trial in Putnam County of the murder in 2010.[5] In 2015, the Second Department of the Appellate Division, New York State Supreme Court, reversed Anthony's conviction, finding,

> Under the circumstances of this case, these errors were not harmless. The only evidence linking the defendant to this crime consisted of the statements made by the defendant to the police, which were contradicted by the defendant's testimony at trial and by the testimony of other witnesses and evidence presented by the defendant. Given this conflicting evidence as to whether the defendant was involved in the shooting at the garage, the evidence of his guilt was not overwhelming and, thus, "there is no occasion for consideration of any doctrine of harmless error." Even assuming that there was overwhelming evidence of guilt, we cannot conclude that there was no significant probability that the jury would have acquitted the defendant had it not been for

---

[2]     https://www.nysenate.gov/legislation/laws/CPL/720.10
[3]     https://www.newstimes.com/news/article/garrison-garage-owner-found-dead-100440.php
[4]     *People v Grigoroff*, 14 N.Y.S.3d 497 (N.Y.A.D 2nd Dept., Aug. 12, 2015)
[5]     https://www.scribd.com/document/17323166/June-10th-2009

these errors. Accordingly, reversal is required and the matter must be remitted for a new trial.

*People v Grigoroff*, 14 N.Y.S.3d 497, 501 (N.Y.A.D 2nd Dept., 2015)(citations omitted).  In 2017, Anthony was convicted again and sentenced to 25 years-to-life in prison.  Needless to say, the Grigoroff family, especially Erick, has been deeply devastated by what Anthony has gone through.  Being separated from his twin brother since they were 18-years-old has added to the wreckage that Erick and the family feels the system has wrought upon their lives.

After Erick was released from his prison term, he once again got into another fight at a bar.  He had been there with two friends when violence erupted.  He learned afterwards that people on the other side may have been friends or family members of the person that Anthony had been convicted of killing. (*See* Exh. H). Erick used a knife against one of the people. Afraid of going back to jail, he fled the jurisdiction and went to live and work in Tennessee until he was eventually apprehended two years later.  He pled guilty and received a sentence of 3 to 6 years' imprisonment. After his release, he successfully completed parole in 2024. During this time, he and Jocelyn began a relationship and had their daughter, his first child.  He also became a father figure to Jocelyn's children from a previous relationship. Exh. B, PSR ¶ 43.

## 2. The Inclusion of Cases from When Erick was 17- and 18-years-old in his Guidelines Calculation Warrant a Downward Variance

Both Erick's offense level and Criminal History Calculation ("CHC") include his 2007 and 2009 cases – cases from over 15 years ago, when he was only 17 and 18 years old respectively.  His base offense level is 10 points higher than what it otherwise would be without these two convictions.  His CHC is 6 points, or 2 levels, higher than what it would be if only his adult conduct was included.

Science now shows that not only are there changes in personality beyond child and adolescence but that extreme forms of behavior and traits diminish too. In fact, the majority of youth who engage in antisocial behavior and display callous-unemotional or psychopathic traits show a decrease in criminal behavior with age (Baskin-Sommers et al. 2015); with interventions, this decline is even greater (Caldwell et al. 2016). **Given the potential for change in the individual and their environment throughout development, the ability to predict future criminal behavior based on prior behavior is tenuous at best. Sentencing decisions based largely on past behavior further open a door to subjective bias reflecting stigmas**

**associated with extreme behaviors and traits as well as racial disparities that permeate the US criminal justice system.** Developmental science played a decisive role in the US Supreme Court decisions in *Roper* and *Miller* that youth should be treated differently from adults in the US criminal justice system. Now the science shows unambiguously that 18-, 19-, and 20-year-olds are more similar than different from 17-year-olds in many important aspects of behavioral and brain maturity, a conclusion that has already been drawn by the US legal system in other domains (e.g., regulation of tobacco sales to youth younger than 21). . . The US justice system proclaims the importance of compelling evidence in the regulation of laws. So, let the evidence speak and prevent the opportunity for subjective bias in punitive sentencing decisions for youthful offenders and extend *Roper* and *Miller* beyond 17 to at least the 18–20 period of young adulthood, as other laws do. Let the behavior at the time of parole hearings be the defining basis for release and limit punitive death and life sentences given that the scientific evidence clearly shows the potential for change.

B.J. Casey, C. Simmons, L.H. Somerville, and A. Baskin-Sommers, *Making the Sentencing Case: Psychological and Neuroscientific Evidence for Expanding the Age of Youthful Offenders*, Annu. Rev. Crimonl. 2022, 5:321-43 (emphasis added). As this article demonstrates, the Guidelines' inclusion of youthful convictions from highly variable state court practices to classify the prosecution of people aged 18 and under makes it so that arbitrariness and racial disparities can become part of adult sentencing outcomes.

    The Supreme Court reasoned in *Roper v. Simmons* that juveniles have "diminished culpability" compared to adults based on the nature of youth.[6]  It found that young people exhibit "a lack of maturity and an underdeveloped sense of responsibility."[7]  And that, juveniles are more susceptible to negative influences and peer pressure, partly because they often "have less control, or less experience with control, over their own environment."[8] Lastly, "the character of a juvenile is not as well formed as that of an adult."[9]

    Part of the reasons Erick's 2007 and 2009 cases are included in his CHC and offense level enhancement are because he served such long sentences on them. These convictions were from Westchester County Criminal Court. Studies show that Westchester County Court is more punitive than neighboring courts. 77% of people charged with felonies in Westchester County ultimately resolve their cases

---

[6] *Roper v. Simmons*, 543 U.S. 551 (2005)
[7] *Id.*
[8] *Id.*
[9] *Id.* at 570.

12

with felony convictions, compared to 66% nationwide.[10]  It is no doubt that Erick, who did not even receive Youthful Offender treatment at 17-years-old, was punished harshly and excessively for the crimes of his youth, in a way that he likely would not have been elsewhere.

Your Honor has the discretion to consider this, the developmental science about young people's brain maturity, and the trend of the U.S. Supreme Court decisions that find youth should be treated differently from adults in varying downward from the Guidelines Calculation in this case.

### 3.  <u>Purposes of Sentencing</u>

Lastly, in determining the appropriate sentence, 18 U.S.C. § 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence for criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

A 24-month sentence is sufficient to serve the ends of 18 U.S.C. § 3553 for Erick.  This sentence is in the middle of a 21-27 month Guideline range, which is one that would include only Erick's convictions for conduct from when he was an adult, at age 26 and 32. By successfully completing parole only last year, seeking mental health treatment voluntarily, and accepting responsibility in this case, Erick has demonstrated that he will lead a law-abiding life moving forward.  He will remain committed to mental health treatment and sobriety, and will seek to keep gainful employment, so that he can be there for his daughter and mother moving forward.  24 months is a substantial sentence, which reflects the seriousness of the offense of possessing a gun and promotes respect for the law.

### <u>Conclusion</u>

Erick's early adulthood has been deeply affected by the unfair treatment he received in schools, in the Child Protective Services system, and in the courts.  But, as a 35-year-old adult, and father, he recognizes that the change in his life must start with him.  His willingness to seek help shows this.  He aims to continue his ████████████████████████████████████████████████████████ productive life that he has longed to achieve for so long.  We urge the Court to acknowledge that there is hope for his future, and to allow him to finally leave the

---

[10] Empire State of Incarceration: Correcting the Overuse of Jail, Vera Institute.  December 2017. https://vera-institute.files.svdcdn.com/production/downloads/nys-jails-fact-sheets/Westchester.pdf

past behind him, by sentencing Erick to 24-months imprisonment and the maximum term of supervised release, 3 years.

Sincerely,

/s/ Jane White

Jane White, Esq.
Assistant Federal Defender

Cc:    Assistant United States Attorney Carmi Schickler

Exhibit A

# **Exhibit B**

November 10, 2025

Honorable Nelson Roman
U.S. District Court Judge
300 Quarropas St.
White Plains, NY 10601

Dear Hon. Judge Roman,

My name is Daniel Greenwood. I am a 31 year old, single father raising my two children, who are two and five years old, completely on my own.  I am employed at Southern Health Insurance in Port St. Lucie, Florida.  I recently relocated to Florida, but I was born and raised in New York, I grew up in Cortlandt Manor.  I have been a close personal friend of Erick Grigoroff for about 15 years.

Erick's growing up was extremely rough, not having a father figure around and living in a small racially divided town, he has been disadvantaged since day 1. Being around him over the last 15 years, I have witnessed how much he is targeted unfairly by police in our towns.  Between that and ███████████████████ ██████████████████ I strongly do not believe he deserves a heavy sentence.  During my friendship with Erick, I have been ███████████████ ████████████████████████████████████. Any time I've ever needed help when ███████████████████████████████████, Erick has always been there whether it was to help me watch my children or help me get to the grocery store. Erick has a huge heart and ███████████████. Sending him away for years to a more than likely violent place isn't going to do anything but hurt the situation. Please take my thoughts into consideration before sentencing.

Sincerely,

/s/ Daniel Greenwood

<u>Exhibit C</u>

Honorable Nelson S. Roman

United States District Judge

Southern District of New York


Re: Character Letter for Erick Grigoroff


Dear Judge Roman,


My name is Jocelyn Marrero, and I am writing to express my wholehearted support for Erick Grigoroff. I have known Erick since childhood, and over the years I have witnessed both his struggles and his strength of character. Like all of us, he has his flaws, but he is also a man with a deep heart, a strong will to grow, and the capacity to positively impact the lives of those around him.


Even as a child, Erick carried a protective and caring spirit. I remember sneaking out of the house after arguments with my mother, and Erick would always make sure I was safe and home on time. He has always expressed his love through acts of service — cooking for others, ensuring everyone was fed, making sure we were always taken care of — small but meaningful gestures that showed how deeply he cared. Even during times of disagreement, Erick's instinct was to look after the people he loved.


As an adult, Erick has ███████████████████████████ While we can never fully know how it shaped his childhood, we have seen its effects in his adult life. Despite these battles, Erick has shown resilience and the ability to grow. When he became a father, I watched him soften, shift, and strive to be a light for his daughter and even for my own children. In the middle of his personal storm, he worked to be someone they could depend on — and that speaks volumes about the man he is at his core.


Erick is detail-oriented, selfless, and deeply compassionate. He has always been the kind of person who would give his last to someone in need, even if it meant going without himself. These qualities, when paired with the right support and guidance, can help him

thrive not just as a father and family man, but also as a contributing member of his community.

Looking forward, Erick has expressed a genuine desire for change and rehabilitation. He is committed ████████████████████████████████████████, and we have talked about building a more stable future together. One of our shared dreams is to start a family business — something that would not only provide for us financially, but also allow Erick to channel his focus, his attention to detail, and his love of cooking into something meaningful and lasting.

I sincerely believe Erick deserves the chance to come home and work toward these goals. He is not beyond redemption — in fact, he has already demonstrated that he is capable of love, growth, and responsibility, even under challenging circumstances. With the right support system and opportunities for rehabilitation, I know Erick can continue on a better path.

Thank you for your time and consideration in reading my letter. I respectfully ask that you see Erick not only for his past, but for the father, partner, and man he is striving to become.

Sincerely,

Jocelyn Marrero

Exhibit D

November 16, 2025

Dear Honorable Judge Nelson Roman,

My name is Gregory Grigoroff. I am Erick's older brother. I've been really close with my brother. Since our younger years, I felt like a father figure to my brother. I've always been there for my brother and I always will. I've had many jobs in my life from driving trucks to construction to being a barber. I grew up in the rough streets of Yonkers, New York around the 90s and times was a little different. I know we wish we could all go back to the 90s, it was the best era.

My little brother's name is Erick Grigoroff and both my brothers mean the world to me and our family, especially to my mother. Erick is the last one my mother had. Eric is also a twin and me and my sisters we help raise my little brothers. We didn't really have a dad in our life. He wasn't too far, but he wasn't exactly in our life for certain lessons in life. Me and my brothers all learned, I would say, the hard way. For the most part we did grow up in Yonkers. Eventually, my mom noticed that if you change the scenery, maybe you could change someone's actions so she took us to Croton-on-the-Hudson. Being that my brother is, I want to say the runt of the litter, my brother is the toughest little guy I ever met in my life. He might not be the smartest person in the room, but for sure he has the biggest heart. He doesn't really know too much how to express his emotions and it could have to do a lot with the situations he's been in the system, but he still has a lot of manners and respect for people.

My mother, her name is Gloria Grigoroff and she's not originally from this country. The age my mother came to this country, she was so young that she basically grew up here in America and learned English and worked at a nursing home for over 30 years. Eventually, my mother noticed the area that her first three kids, my older sister, my younger sister and me, that it wasn't the best place to continue raising a family so she decided to move a little further up Westchester into Croton-on-the-Hudson.  I believe there is where my brother was getting the short end of stick.  One of the first incidents was that my brother got in trouble for was he brought two water guns to school and the school I believe took it a little too far for a child bringing in a toy and then from there on he wasn't allowed in a normal school like everyone else he had to go to a special school because of this incident and it wasn't really that serious. It was water guns, he wanted to enjoy time with his friends playing around with water guns and they didn't look nothing like real guns they were orange and green and like a super soaker from the early 90s or late 90s, it was a big thing but that's where my brother first got in trouble. And the police in that town took notice

of me and my family. Another incident that happened inside the same town was there was this swimming area that people weren't really allowed to go to, but the locals in that town all knew this area which was called Dickies. It's like a river where people jump in. They jump off a cliff into the water. They enjoy it. So one day my brothers was there and a lot of other people was there because it was a big thing in Croton-on-the-Hudson. My brothers was there one day in the summer enjoying it like everybody else and an incident happened, when a car was vandalized and my brothers were accused of it. They told the police they never did it. Now there was one officer in particular, his name is Nicopolis. He took advantage of the situation. My mother doesn't understand the law as much as much as she should in this country and he took advantage of the situation where he forced my mom to tell my brothers to say they did it because he said that he had a video proof of it, which was all a lie. But he made one of my brothers feel like he did it, when in reality he didn't have nothing to do with it, but the officer persuaded them enough to make him say that he did do it and from then on, Erick was like boiling water in that town. He had a target on his back, especially with this cop. I'm talking about that he had a target on my brother's back. I don't want to say too much wrong about officers because not all of them are bad. I have a brother-in-law that's a state trooper/FBI agent, who is a great man, takes care of my sister and both his kids so I don't want to seem like I'm downplaying the police, but that officer was not a fit for that job in my opinion. So like I said, he had a target on my brother's back and that's what gave it to him, initially, after the car incident. It gave him probation and that's where it all started to get messy for my brother. Croton-on-the-Hudson was a predominantly all-white town and we were some of very few minorities in that town. There was like 5 families that were Hispanic or black in Croton.

My brother ended up catching this case at possibly the worst time. I believe all this happened around last year, around my mother's birthday in March, and it's cause a lot of sadness that my brother once again was in a situation like this. I don't really know all the details about the case but I do understand my brother is trying to plea out, hoping he doesn't get sentenced to too long of a time, so he could make it back and adjust his life accordingly to his new family. He now has a daughter and I believe he found a woman that would love him back the same way he would love them. My brother has lost a lot of time to the system and I pray that one time in his life, somebody looks out for him and gives them a chance and understands a person's actions can be caused by some of his past situations. But I believe now my brother's got his head on the right way and he plans to come home and enjoy the rest of his life, safe, free and with his new daughter. He could live the fairytale life that everybody dreams out in their head. So hopefully this letter can give you a little background on my brother and his situation and hopefully everything works out the way it's supposed to. I don't want to take too much of your time up, rambling, but Honorable judge Nelson Roman, if you can find it in your heart to give my brother a second chance, it would probably be one of the best news I've heard in a long time. I want to thank you for reading my letter and allowing me to write to you.

God bless you either decision you make and again thank you.

Sincerely,

Gregory Grigoroff
Older brother of Erick Grigoroff

Case 7:25-cr-00390-NSR    Document 2341    Filed 11/24/25    Page 26 of 45

<u>Exhibit E</u>

Gloria Grigoroff

47 South Drive

East Windsor, NJ 08520

September 17, 2025


Judge Nelson Roman

United States District Judge

Southern District of New York


Re: Support Letter for Erick Grigoroff


Dear Judge Roman,


My name is Gloria Grigoroff, and I am the mother of Erick Grigoroff. I am writing to you from the bottom of my heart to share with you who my son is beyond this case.


Erick has faced many struggles throughout his life. From the time he was a child, he experienced racism and discrimination in school, which left him feeling different and often unwelcome. He also endured betrayals from people he trusted, which hurt him deeply and shaped how he saw the world. As an adult, ███████████████████████ something that finally explained the struggles and challenges he carried for so long without understanding why.


Even with all of these hardships, Erick has always been happiest when he is surrounded by the people he loves. Around his family, especially his daughter, he is full of joy, laughter, and tenderness. He has a heart that is loyal and caring, and I know him to be someone who will give of himself to help others.

I do not deny that my son has made mistakes. But I truly believe he is not defined by those mistakes. With the right guidance, support, and structure, Erick has the ability to live a positive and productive life. He loves his family and wants to be present for his daughter, and I know that motivation is strong in him.

I respectfully ask that you see my son not just for his struggles, but for his potential and the goodness that still lives inside him. He is more than his hardest moments, and I have faith that with the right opportunity he can turn his life in a better direction.

Thank you for your time and consideration.

Respectfully,

Gloria Grigoroff

# Exhibit F

**Akemi Alvarez**

70 Hawthorne Ave Apt. C-1802
Yonkers, NY 10701

Dear Judge Nelson Roman,

My name is Akemi Alvarez. I am a lifelong family friend of Erik Grigoroff. His mother Gloria and my mother were best friends (practically sisters) until my mother's passing in 2018. Erik, his siblings, my siblings and I grew up like cousins. I have known him his entire life. He, his identical twin brother Anthony and my youngest brother are five months apart (my brother "Ramon" being the youngest).

I am writing to you to share who Erik is and how I know him to be. Between Erik and his twin brother Anthony, Erik is the more outgoing twin. He has a smile that lights up every room he goes into. He is funny, charismatic, and fiercely protective of his family. When Erik was about 5 years old, his mother moved the family from Yonkers, NY to the small town of Croton Harmon on the Hudson to give her children a better opportunity of not falling prey to the environment. As a single mother she tried to give her 5 children the best opportunities she possibly could. I helped her make that move at the time. Being a recent high school graduate then, my path led me to college out of state and therefore there were less interactions with Erik during his formative years, but the fact that our mothers were best of friends there was no absence of connection. We shared family functions, reunions, and holidays together. Therefore, there were many chances to watch him grow throughout the years. Last year, Erik joined the family for the second annual family reunion in Maryland hosted by my youngest brother and his wife. During that reunion weekend he made us laugh and shared stories of their childhood with our friends and family. He was absolutely incredible with the all of our children. He was animated in his storytelling. Taking us back to the times when the three (Erik, Anthony, and Ramon) of them were energy filled, rambunctious kids. They are more like brothers than friends. Watching him with my brother together was emotional and heartwarming. The way recalled he the events of their past was incredible. His interactions with and his protection of our children was the best. He would intervene when we chastised the children and reminded us that we did the same things when we were their age (even though there is a 12-year gap between me and him). Erik is a sensitive, strong-willed, caring, and intelligent human being. I love and consider him a sibling more than a family friend and I know that he sees me in the same light.

Erik has spent the better part of his adult life behind bars. I believe that he is conditioned to be institutionalized than being free and out of the confines of an institution under the control of an authority. I believe that freedom is something that is illusive to Erik. As a Latino-American man in the US, he has been otherized. Moving away from a larger, diverse city to a smaller, less diverse

town, can be jolting and less forgiving. The lack of an involved father is very impactful on that of a young boy because that guidance is missing for how to interact in society in a manner that is acceptable, regardless of the environment they go into. I also believe that this constant institutionalization has developed a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ n Erik that without help have been exasperated over the years. Erik's decision-making skills have been impacted by the experiences that I believe no developing youth, young adult and now adult man could ever face without lasting consequence without being addressed appropriately. His engagement and the influence of the wrong crowd can influence to choices he has made. Continuous institutionalization, in my opinion would be of a greater detriment than aide to Erik. While his mother did and continues to do everything, she can to care for, protect and provide for Erik and his siblings, she is only one parent and that is hard. Please consider providing Erik the ▮▮▮▮▮▮▮▮▮▮ so that he can be better, live better and have an even larger support for a better outcome. I know that he understands that his life choices have not yielded the best outcomes, and that they have affected more than just him. I also know how much he loves his one-year old daughter. I can attest to immense impact children can have on our lives. They grant us a strength, focus and ambition to do better and be better for them to have greater experiences than the ones afforded to us and I know that is true for Erik and a father. When he and his girlfriend were awaiting the arrival of their daughter there was joy, excitement, and hope in his eyes. Every time I spoke to him prior to his daughter's birth, he would update me on the number of days left for him to finally meet her. For these reasons I pray that you provide him the opportunity to be free to be actively present in his daughter's life and realize the potential of being a productive member of society. Please allow him to be the father that he did not have.

This arrest has impacted me and the family tremendously. My children who are 10 and 11 years old have missed a large part of their lives with Erik. They have heard stories of there uncle and the twins, but they did not know him before their 8th and 9th birthday party. His traveling with us for the family reunion in 2023 tied the stories to their experiences. Now that he is incarcerated, it has made Erik someone they only hear stories about rather than know. They call him "Tio Erik" (uncle Erik) and they miss him very much.

When Erik is released, I know that he intends on finding work to provide for his little family. I am a teacher for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and I am also well connected in the public health sector. I intend on using my resources to help Erik find work and connect to as many resources as I can to help him succeed in life. I know that he has the support of his mother and girlfriend, therefore he will have a place to go.

Please consider these things in your decision making for Erik's future.

Sincerely,

Akemi Alvarez

Exhibit G

United States District Judge
Southern District of New York


Dear honorable Judge Nelson Roman

Thank you for taking the time to read my letter. My name is Yordana Turner , and i am oldest sister of Erick Grigoroff , i am a 46 year old mother of two, i am writing to respectfully share my perspective on his character as you consider his case.

My brother recently became a father, and I have had the privilege of watching him embrace this new chapter with genuine dedication and love becoming a parent has brought out a new level of responsibility, patience, and maturity that I am incredibly proud to see in him .

Outside of being a father Erick has always been someone with a kind heart . He is the first person in our family to offer help when someone is struggling and often puts the needs of others before for his own. I have seen him work hard to create stability for himself and his new family, and I truly believe he is capable of continuing to grow and make positive choices.

I understand the seriousness of the charges before the court. I do not intend to minimize the situation but I hope it can be weighed alongside the progress he has made and the person he genuinely is . With the opportunity to remain present in his daughter life and continue the positive steps he has already begun , I believe he can move forward in a productive and responsible way .

Thank you again for your time and consideration.


Respectfully

Yordana Turner

██████████
████████████
██████████████████
██████████
11/18/2025

Exhibit H

November 20, 2025

Dear Honorable Judge Román,

My name is Erick Grigoroff and I am 35 years old.  I am writing to you not to make excuses for my actions or my past, but to explain some of what has happened in my life, for you to consider before you sentence me.

If you look at all of my past cases that involve fighting, the violence has been because I have in bars when fights broke out and felt I had to fight back to defend myself and my family and friends.  It would be just a few of us against large groups of people everytime. I thought because I was not ever looking for trouble in these situations that they wouldn't happen again.  It wasn't ever at the same bar.  I would never go back to the places where these things happened, so, at the time I thought it wouldn't happen again.  Each was in a different town.  The people I was with were severely beaten. My twin brother had to be airlifted to the hospital following one of the assaults.  I was not looking for trouble. I was told that the last fight I was arrested for were friends or family members of the victim from my brother's case. One reason I think I had a gun was for protection based on these past fights. Looking back, I wish I would have thought of better ways to handle those situations. I could have left. I don't need to have a gun and I know I can't have one. Moving forward, all I want is to be with my family, not in these situations.

I've been through a lot in prison and on the street.  In state prison in Five Points, there was a time when a bag was put over my head after black pepper was thrown in my eyes.  I was handcuffed and couldn't do anything.  When I was 17, in Valhalla, I was stabbed in the back of the head by another inmate.  I had to have my head stapled.  At first I almost didn't feel it but when I laid down and put my hands behind my head, I had so much blood on my hands and in my bed.  In Peekskill, my brother Anthony and I got jumped many times by older guys.  We never went to the police about any of it because it we didn't feel like we could.  My mom would be really scared of us going anywhere and tried to keep us home. But we were kids and we wanted to go places.

Being institutionalized, I had to learn how to survive.  I think that's why I have gotten into so many problems on the outside.  Looking back on it, it's caused a lot of stress.  I don't know how to talk about my feelings or open up because I was constantly in situations where I had to be guarded and close myself off to protect myself.

When I got put into ███████████, I was so young and it was so hard to understand what was really going on.  I remember feeling really bad to be separated from everyone else.  My brother Greg would come with me for the first couple of days.  He was only 15 at that time. There was ███████████████.  I didn't know why I was there.  From then on I never went ███████████████████████████████████

confused, unfairly punished, and like no one would ever listen to me.

Being in prison is not something I can continue doing. I am feeling it more because my mother is older. My father already died, and she is all I have left. I was arrested on her 63rd birthday. I still remember her crying when I called her from the police station after I was arrested. It broke my heart. I am away from my daughter, who was only months old when I

was arrested. When I see my daughter during our jail visits it makes me want to be there for her. I never felt this responsibility for someone else. It's something new to me, being a father. I am still learning. I want to make her life better. Whenever I am released, I plan on making up for lost time with my daughter and my partner. We have had discussions about the life we want to create for our family. I have plans to get a food truck and cook my mom's recipes. I hope to do this with her █████████████████████████. I couldn't sleep at night and ███████████████████████████████████████████ I recently have ███████████████████████ For the first time in a long time, I've had a good night's sleep. ████████████████████████████████████████████████████████████████████

different when I am released. I will have to care for someone else for the first time in my life. My daughter and my mother are my motivations to not return to prison. I am tired of being in jail. In thinking about my future, I hope I can leave New York, and I plan on leaving so I can start a new life with my family. I am not a bad person, but I know I have made some really bad decisions. I accept the punishment you will give me today, and I will work on myself every day to not return before you ever again.

Sincerely,

Erick Grigoroff

Exhibit I